UNITEX INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58752.    Filed May 29, 1958.

*Robert J. Hobby, Esq.*, and *Wentworth T. Durant, Esq.*, for the petitioner.

*Douglas M. Moore, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in income tax of petitioner for the year 1953 in the amount of $8,164.82. The petition alleged error on the part of respondent with regard to the deficiency determination and, in addition, alleged overpayments of taxes resulting from the overstatement of dividend income in 1953 by the amount of $164,000. It has since been agreed that petitioner overstated its dividend income for 1953 by the alleged amount

The sole issue for determination is whether certain payments in the amount of $32,883.15 by petitioner in the year 1953 constitute a deductible expense.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioner is a corporation organized under the laws of the State of Texas and has its principal place of business in Dallas, Texas. Its corporate income tax return for the calendar year 1953, the only year here involved, was timely filed with the district director of internal revenue at Dallas.

Petitioner's original charter was filed with the State of Texas on August 5, 1952. The pertinent provisions of that charter are:

### I.

The name of the corporation shall be I. C. T. DISCOUNT CORPORATION.

### II.

The purpose for which it is formed is to accumulate and loan money; to sell and deal in notes, bonds, and securities; to act as Trustee under any lawful express trust committed to it by contract or will, or under appointment of any court having jurisdiction of the subject matter, and as agent for the performance of any lawful act; to subscribe for, purchase, invest in, hold, own, assign, pledge, and otherwise deal in and dispose of shares of capital stock, bonds, mortgages, debentures, notes and other securities or obligations, contracts and evidences of indebtedness of foreign or domestic corporations not competing with each other in the same line of business; to borrow money or issue debentures for carrying out any or all purposes above enumerated; but without banking or insurance privileges, as authorized by Article 1303 (b) of the Texas Revised Civil Statutes of 1925.

### III.

The places where the business of the corporation are to be transacted are Dallas, in Dallas County, Texas, and elsewhere within or without the State of Texas, in accordance with the laws of said State, and its principal place of business is to be in Dallas, in Dallas County, Texas.

### IV.

The term for which it is to exist is fifty (50) years.

*       *       *       *       *       *       *

### VI.

The number of shares of the total authorized capital stock of the corporation is One Hundred Twenty-One Thousand (121,000) shares, divided into two classes, namely, Common Stock with a par value of TEN CENTS ($.10) per share, and Preferred Stock without nominal or par value, the shares of each of such two classes being equal in all respects as among themselves, but differing from the shares of the other class in the respects hereinafter designated. The amount of such Common Stock is TEN THOUSAND DOLLARS ($10,000.00), divided into One Hundred Thousand (100,000) shares, each of the par value of TEN CENTS ($.10), all of which has been in good faith subscribed and fully paid for in cash, as is further shown by affidavit and certificate attached hereto. The total number of shares of such Preferred Stock is Twenty-One Thousand (21,000), all

without nominal or par value, of which Two Thousand One Hundred (2,100) shares, which is ten percent. (10%) of the total of such shares, have been paid for, the corporation having received TWENTY-FIVE THOUSAND TWO HUNDRED DOLLARS ($25,200.00) of money paid in actual consideration therefor, as is further shown by certificate authenticated by the incorporators and hereto attached.

## VII.

The preferences, designations, rights, privileges, and powers of the above stated classes of stock, and the restrictions, limitations, and qualifications thereof are as follows:

1. The holders of the Preferred Stock shall be entitled to receive, but only when and as declared by the Board of Directors, out of funds legally available for the purpose, cumulative cash dividends at the rate of SIXTY CENTS ($.60) per share per annum. Dividends may be payable monthly, quarterly, semi-annually, or annually, upon such dates as the Board of Directors shall determine.

2. Whenever, after the declaration or payment of all accumulated dividends upon the Preferred Stock, any surplus profits shall remain, the same may be paid in dividends in equal amounts upon each share of Preferred Stock and upon each share of Common Stock of the Company.

3. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, whether voluntary or involuntary, or in the event of any distribution of assets of the corporation, otherwise than by dividends from funds legally available therefor, the holders of the Preferred Stock shall be entitled to receive, equally and ratably before any distribution is made to the holders of the Common Stock, the sum of TWELVE DOLLARS ($12.00) per share of such Preferred Stock held by them, plus accrued and accumulated unpaid dividends. After the payment of such sums, the Common Stock shall receive its par value per share. The remainder of the assets, if any, shall be distributed in equal amounts upon each share of Preferred Stock and upon each share of Common Stock of the company. If the funds legally available for the distribution to the holders of Preferred Stock in such connection shall be insufficient to permit payment in full of the preferential sums above set out, then all such funds shall be distributed ratably among the holders of Preferred Stock then outstanding.

4. Consent of the holders of at least two-thirds (⅔) of the Preferred Stock at the time outstanding, or such greater percentage as may be required by law, shall be necessary and shall be sufficient for the effecting or validating of any one or more of the following transactions:

(1) Any charter amendment adversely affecting the rights of the holders of the Preferred Stock, as such;

(2) The sale, lease or conveyance by the corporation of all, or substantially all, of its property or business;

(3) The authorization or creation of any additional class of stock ranking prior to the Preferred Stock, provided, however, that the consent of the Preferred Stock is not necessary in the event additional Preferred Stock on a parity with said Preferred Stock is authorized or created, and provided further that the consent of the holders of said Preferred Stock is not necessary in the event indebtedness of the corporation is authorized or created which ranks prior to said Preferred Stock.

5. Except as hereinafter expressly provided and except as may otherwise be required by law, the holders of the Common Stock shall have the exclusive right to vote for the election of directors and for all other purposes. Each holder of Common Stock of the corporation shall have one (1) vote for each share thereof held.

On September 8, 1952, petitioner's charter was amended so as to provide for dividends on its no-par-value preferred stock at the rate of 72 cents per share per annum instead of 60 cents per share per annum as provided in the original charter. On November 12, 1952, petitioner's charter was again amended, this time to provide for an increase in its authorized no-par-value preferred stock to 200,000 shares. On January 6, 1953, petitioner's charter was amended further so as to increase its authorized no-par-value preferred stock to 500,000 shares. The other charter provisions relating to its preferred stock remained unchanged. During the latter part of 1952 and throughout 1953, petitioner entered into numerous subscription contracts with subscribers relative to its no-par-value preferred stock, the pertinent provisions of which are:

This subscription contract is entered into with the understanding that the capital stock of said corporation is composed of Cumulative Participating Preferred Stock and Common Stock; that the stock hereby subscribed for is Participating Preferred Stock and the Participating Preferred Stock is to be paid an annual dividend of SEVENTY-TWO cents ($.72) per share, SIX PERCENT (6%) based on TWELVE DOLLARS ($12.00) per share cost. After said Participating Preferred Stock has received a SEVENTY-TWO CENT ($.72) per share dividend for the current year, all additional dividends paid in that year shall be paid at the same rate on all stock, both Preferred and Common, without distinction as to class, share for share.

It is agreed that no stock certificate is to be delivered to subscriber until the amount of this subscription is paid in full. However, dividends will be paid on shares as they are paid for by the subscriber, even though no stock certificate has been delivered to subscriber. It is also agreed that the balance due on said subscription may be paid in full at any time, and the Participating Preferred Stock certificate will be delivered immediately.

It is hereby warranted by the subscriber that he (she) is a bona fide resident of the State of Texas, and should it be determined in any legal proceeding of whatever nature that he (she) is not a bona fide resident of said State, this subscription is and shall thereafter be null and void.

It is understood and agreed that in the event subscriber defaults in monthly payment, the Company at its option may cancel the balance of the subscription and delivery [sic] to subscribe [sic] stock certificate for the number of shares for which he has paid.

This subscription contract contains the entire contract between the subscriber and the corporation, and no agent of the corporation or any other person has any power to change or alter the terms of this subscription.

In addition to the above subscription contract, the arrangement with subscribers provided for installment payments of the subscription price in multiples of $12.

A card record was kept for each stockholder and subscriber of the no-par-value preferred stock which indicated the status of the account. If a subscription payment was received prior to the 15th of the month, it was treated as having been received on the first of the month for purposes of computing the payments to be made by petitioner on that

account. If a payment on a subscription contract was received after the 15th of the month, it was treated as having been received in the succeeding month. The dividends of petitioner were paid quarterly. In those cases in which the subscription installment was received during a dividend period, the amount of the dividend was averaged over the proportionate time for which the corporation held the subscription payment.

Pursuant to the subscription agreements, petitioner paid during the calendar year 1953 the sum of $32,883.15 with respect to the installments made by the subscribers of its unissued no-par-value preferred stock. These payments were made at the same time and out of the same funds (bank account) as were the dividends on the issued and outstanding no-par-value preferred stock. In those instances in which both dividends on issued and outstanding preferred stock were paid and amounts pursuant to the subscription agreement were paid on the unissued preferred stock to the same individual or person, a single check was drawn to his account.

On the corporate income tax return for calendar year 1953 petitioner deducted as interest expense the $32,883.15 it had paid to the subscribers of its unissued preferred stock. Respondent disallowed this amount as an expense deduction.

OPINION.

Petitioner contends that the subscribers of the unpaid subscriptions were in a creditor-debtor relationship with the corporation as to that portion of the subscription contract which had been paid in, and that, therefore, the payments made to those subscribers constitute interest, deductible under section 23 (b) of the Internal Revenue Code of 1939.[1] We do not agree with petitioner.

While this case presents a factual situation which has not heretofore been before this Court, the general problem is not new. In deciding whether a certain class of certificate holders are creditors or stockholders of a corporation, the determining factors are usually listed as the name given to the certificates, the presence or absence of maturity date, the source of the payments, the right to enforce the payment of principal and interest, participation in management, status equal to or inferior to that of regular corporation creditors, and the intent of the parties. See *John Kelley Co.*, 1 T. C. 457 (1943), affd. 326

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(b). INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

U. S. 521 (1946). No one factor can be considered as controlling. As the Supreme Court, in affirming the Tax Court in the *John Kelley Co.* case, stated at page 530:

There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So-called stock certificates may be authorized by corporations which are really debts, and promises to pay may be executed which have incidents of stock. * * *

The courts have indicated that the existence of a fixed maturity date is the most significant feature of a debtor-creditor relationship. *United States* v. *Title Guarantee & Trust Co.*, 133 F. 2d 990 (C. A. 6, 1943); *Haffenreffer Brewing Co.* v. *Commissioner*, 116 F. 2d 465 (C. A. 1, 1940), affirming 41 B. T. A. 443 (1940); *United States* v. *South Georgia Ry. Co.*, 107 F. 2d 3 (C. A. 5, 1939). The absence of a maturity date, however, does not necessarily destroy the character of an indebtedness. *Schmoll Fils Associated, Inc.*, 39 B. T. A. 411 (1939). The court in *United States* v. *Title Guarantee & Trust Co.*, *supra* at 993, stated:

*The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them.* * * *

The preferred stockholders were entitled to share in petitioner's profits equally with the common stockholders to the extent of earnings and profits after payment of the preferred dividend of 72 cents per share of preferred stock. Certainly, the preferred shareholders intended to embark upon the corporate venture, taking the risks of loss attendant upon it, so that they might enjoy the chances of profit. The preferred shareholders possess the attributes of stockholders and not creditors, and petitioner does not contend otherwise.

Nevertheless, it is petitioner's position that the preferred stock subscriber is not a shareholder until the stock has been issued to him, which, under Texas law, cannot be done until payment of the full subscription. From this fact, petitioner argues that, if the subscriber is not a shareholder, he must stand in a creditor-debtor relationship with the corporation.

The contract in this case between the petitioner and the subscribers of the no-par-value preferred stock expressly stated that "dividends" would be paid on the subscription deposits at the rate of 72 cents per $12 deposited with the company. It was not intended that petitioner would pay "dividends" on any amount less than $12, or on an amount which was in excess of a multiple of $12.

Under the contract with the subscribers, petitioner's obligation was to issue the preferred shares upon payment of the full subscription

price. If only part of the price were paid and there was a default in the subscription payments, the petitioner could issue preferred shares for the amount of the payments that had been received. Petitioner had no obligation, under the subscription contracts, to return any part of the subscription payments. Neither under the contract nor in actual practice did this arrangement constitute an "indebtedness" within the meaning of section 23 (b). As the Supreme Court of the United States in *Deputy* v. *du Pont*, 308 U. S. 488 (1940), stated at pages 497, 498:

But although an indebtedness is an obligation, an obligation is not necessarily an "indebtedness" within the meaning of § 23 (b). Nor are all carrying charges "interest." In *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552, this Court had before it the meaning of the word "interest" as used in the comparable provision of the 1921 Act (42 Stat. 227). It said, p. 560, ". . . as respects 'interest,' the usual import of the term is the amount which one has contracted to pay for the use of borrowed money." * * * It refused to assume that the Congress used the term with reference to "some esoteric concept derived from subtle and theoretic analysis." * * *

Petitioner argues that the arrangement, in effect, contained a maturity date, namely, the date upon which the stock was to be issued, and that this factor is indicative of a creditor-debtor relationship. However, this so-called maturity date is not the maturity date of an indebtedness. The normal maturity date of an indebtedness is the date upon which money loaned is to be repaid. To place the interpretation upon "maturity date," which petitioner would have us do, would extend the term to include any date on which there is an obligation to deliver something to another. For example, such a construction would mean that the existence of a date for payment of dividends, or in the case of liquidation or redemption, a date for repurchase of the shareholders' interest, would give rise to a creditor-debtor relationship between all shareholders and the corporation. It is hardly necessary to state that such a construction was never contemplated as being within the purview of a section 23 (b) indebtedness. See *Deputy* v. *Du Pont, supra.*

The subscribers of petitioner's no-par-value preferred stock agreed to pay to petitioner certain amounts for an interest in the corporation. The creditors of the corporation could look to the unpaid subscriptions to satisfy their claims against petitioner in the event of default. *Bank of De Soto* v. *Reed*, 109 S. W. 256, 260 (Civ. App. Tex., 1908). Upon default in payment by a subscriber, the petitioner could at its election sue to recover from the subscriber the amount due and owing on the subscription agreement. *McCord* v. *Southwestern Sundries Co.*, 158 S. W. 226 (Civ. App. Tex., 1913). The subscribers of the preferred stock are obligated to pay petitioner the total subscription price, and have, in that sense, put the full amount of the subscription at the risk of the business. The subscribers did not in-

tend to loan money to the petitioner and become simply creditors of the corporation. They intended to become owners in the corporation, and they paid in the subscriptions with that intent. This factor, as said in *United States* v. *Title Guarantee & Trust Co., supra,* is the essential difference between a stockholder and a creditor.

The purpose of the subscriber in this case was to "embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit." *United States* v. *Title Guarantee & Trust Co., supra* at 993. As such, the relationship between petitioner and subscriber here is not that of debtor-creditor, but that of corporation-stockholder.

Petitioner argues in the alternative that, if the payments are not interest payments under section 23 (b), then they are ordinary and necessary expenses incurred in carrying out the loan and discount business and, therefore, deductible under section 23 (a) (1) (A) of the 1939 Code. Petitioner has not suggested in what category of ordinary and necessary expense under section 23 (a) (1) (A) the payments here involved would fall, nor does it appear that any exists. If a payment is not an "expense," it is not deductible under section 23 (a) or (b), regardless of how ordinary and necessary it might be.

The payments in question are not deductible as an expense within the purview of section 23 (a) (1) (A) or (b) of the 1939 Code.

*Decision will be entered under Rule 50.*